STATE OF HAWAII, Plaintiff-Appellee *v.* JAMES POKINI, also known as James K. Pokini, Defendant-Appellant

NO. 5694

APRIL 7, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA AND MENOR, JJ., AND CIRCUIT JUDGE SHINTAKU ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY MENOR, J.

The defendant [Pokini] was indicted on October 11, 1972 for the first degree murder of Doris "Pinkie" McCoy on or about February 1, 1972. He was found guilty of the offense by a jury, and judgment and sentence was entered on May 21, 1974. The defendant appeals from the judgment and sentence and from the order denying his motion for a new trial.

Only one specification of error merits serious consideration. At issue is whether the trial court erred in excluding certain prior inconsistent statements attributed to the State's principal witness, and whether, if the court erred, it is ground for reversal.

1

Robert Low, Bryce Wilkins, and Alfred LeTourneur were members of the gang led by the defendant James Pokini. In

this case, Low was the principal State's witness against Pokini. He testified that it was he and Pokini who killed Pinkie McCoy. At trial the defense attempted to lay the foundation for the alleged prior inconsistent statements:

Q. Mr. Low, you do know a Bryce Wilkins, do you not?

A. Yes, I do.

Q. And you have roomed with him in an apartment for some period of time?

A. Yes.

Q. All right, do you recall having a conversation with Mr. Bryce Wilkins about the latter part of February or in March concerning the killing of Pinkie McCoy?

A. No, I don't.

Q. All right, do you recall about the latter part of February or sometime in March having a conversation with Bryce Wilkins at your working place, auto repair shop in Kapahulu, to the effect that you and Gerrie Durant had killed Pinkie McCoy?

A. Who said that? He did or I did?

Q. You did. Do you remember a conversation in which you said that?

A. I remember no such conversation.

Q. All right. And do you know Alfred LeTourner (sic)?

A. Yes, I do.

Q. Do you recall having a conversation with him in Halawa Jail in about June or July of 1972 while both of you were confined there about the killing of Pinkie McCoy?

A. No, I don't.

Q. All right. During the months of June or July 1972 in Halawa Jail, do you recall telling Alfred LeTourner (sic) that you and Gerrie Durant had killed Pinkie McCoy?

A. No, I have not.

Q. Now, may I go back to Bryce Wilkins. When I refer to the latter part of February or March, I was referring to 1972; do you understand that?

A. Yes, I understand what you're talking about.

The State concedes that the defense had sufficiently complied with the statutory requirement that "the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness." HRS § 621-23. The State insists, however, that the further statutory requirement that a witness "must be asked whether or not he has made the statement" is not satisfied where the witness is asked "do you recall" or "do you remember." This contention is without merit. Where the circumstances accompanying the making of the supposed statement have been called to the attention of the witness upon cross-examination, and he denies having made the statement, or fails to admit it distinctly, or says that he does not remember, the foundation requirements for the impeaching evidence have been satisfied. *State v. Miles*, 73 Wash.2d 67, 436 P.2d 198 (1968); McCormick on Evidence, 2d ed., Section 37 (1972). And in sustaining the State's objection to the proferred testimony, the trial court was in error. The foundation requirement is for the purpose of rekindling the witness' memory, and substantial compliance is all that is necessary. *Cf. Duncan v. State*, 335 N.E.2d 827 (Ind. App. 1975).

II

The crucial question before us, then, is whether the exclusion of such testimony amounted to reversible error. *See State v. Hackett*, 22 N.C.App. 619. 207 S.E.2d 362 (1974); *State v. Laverdure*, 140 Mont. 236, 370 P.2d 489 (1962); *United States v. Oliver*, 492 F.2d 943 (8th Cir. 1974).

The exclusion of competent testimony designed to impeach the credibility of a material witness for the State was error that infringed upon a constitutional right of the accused, and as such was presumptively prejudicial. *United States v. Oliver, supra.* But it is not every constitutional error that will require an automatic mandate of reversal. *Chapman v. California*, 386 U.S. 18 (1967); *Fahy v. Connecticut*, 375 U.S. 85 (1963); *State v. Cuevas*, 53 Haw. 110, 488 P.2d 322 (1971). In *Chapman*, the Court acknowledged that "there may be

some constitutional errors which in the setting of a particular case are so unimportant and so insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal of the conviction." 386 U.S. at 22. The test in these instances is whether the reviewing court is able to conclude, from the record as a whole, that the error was harmless beyond a reasonable doubt. Mere sufficiency of the evidence to support the jury verdict, apart from that aspect of the case affected by the error, would not be enough. *Kotteakos v. United States*, 328 U.S. 750 (1946). *Cf. Fahy v. Connecticut, supra.*

We have reviewed the record in its entirety, and we are satisfied beyond a reasonable doubt that the disallowance of the proferred impeaching testimony did not contribute to the verdict obtained. *Cf. State v. Kahinu*, 53 Haw. 536, 498 P.2d 635 (1972).

Literally speaking, the murder and the manner in which Pinkie McCoy was killed may be said to have come to light as a result of the falling out of criminal elements among themselves. Following their arrests for other crimes during the summer of 1972, the relationships between the members of the so-called "Pokini gang" began to deteriorate and became quite complicated. In June of that year, Phillip Silva and other members had been arrested for other crimes they were charged with having committed. While incarcerated, Silva decided to turn State's witness against Low, Pokini and other gang members. It was at that time that he told the police about Pokini's admitted complicity in the McCoy murder. Evidence of the *corpus delicti*, however, did not come to light until September 2, 1972, after Low had voluntarily and without promise of immunity told the police where Pinkie McCoy's body was buried. It was on that date that her decomposed body was found in its sandy grave and recovered. Subsequently, Low turned State's witness against Pokini in this case, and against Pokini, Wilkins and LeTourneur in other cases.

Robert Low testified at trial that the defendant believed that Pinkie McCoy was becoming dangerous to them and

directed Low to make the necessary arrangements for her disposition. Pinkie was then living in an apartment on Makiki Street with two other females. Low lived in the apartment below with his girl friend, Gerrie Durant. Sharing the premises with them with the permission of Low was Kathy West, a friend of Gerrie Durant. In the afternoon of January 31, 1972, Low instructed Gerrie Durant to tell Pinkie McCoy to meet him at the corner about half a block from their apartment at 7:30 that evening. Low picked her up as prearranged, and then picked up Pokini later that evening. They drove to the North Shore and stopped at a deserted beach area at Kawela Bay. There the victim was ordered by Pokini to disrobe and then was made to kneel at the bottom of a pit which Low had dug in the sand away from the highway. According to Low, the defendant struck the victim several times on the head with a tire iron and on the body with a pickaxe. Both Low and Pokini then buried the dead girl in the sand. Thereafter they drove back to the city. It was then the early morning hours of February 1, 1972.

Detective Benjamin Perez testified that on August 31, 1972, he was assigned to meet with Robert Low at the Halawa Jail. He was not the officer in charge of the McCoy investigation. Not knowing exactly what Low was going to discuss with him, Detective Perez took the initial precaution of warning Low of his constitutional rights. Low, however, chose not to avail himself of those rights, and despite the officer's clear warning that he could not offer leniency or immunity, Low went on to detail several homicides, including that of Pinkie McCoy. The next day, Low with Detective Perez and other officers drove to Kawela Bay where Low pointed out the gravesite of the victim. It was not until trial that Low was granted immunity.

Dr. Alvin B. Majoska, forensic pathologist and medical examiner, testified regarding the wounds received by Pinkie McCoy and the manner in which they might have been inflicted. His findings were essentially consistent with the manner in which Low testified she had met her death.

Emma McCoy, half-sister of the deceased, testified that

in the latter part of December, 1971, the defendant, who had been to their home in Nanakuli on numerous occasions, was visiting with her father, Lester McCoy. During the course of the defendant's conversation with her father, she overheard Pokini tell her father that Pinkie "just gotta go because she going talk and he was scared," which to her meant that her half-sister had to be killed. On cross-examination she testified that after Pokini had gone, she asked her father about what she had overheard, and "[h]e told me that he know and he never like that happen but he never know what to do." It was obvious to her that her father was afraid of Pokini. Pinkie was not living with them at the time, and Emma had no knowledge of her whereabouts.

Kathy West, a friend of Gerrie Durant, and who had been living in the same apartment with the permission of Low, testified that when Low came home for lunch on January 31, 1972, he instructed Gerrie Durant in her presence to tell Pinkie to meet him at the corner half a block from the apartment at 7:30 that evening. Pinkie was then living with two other girls in another apartment on the floor above. Early that afternoon Pinkie came down to the Low apartment, at which time both Gerrie and Kathy told Pinkie she was to meet Low at the corner. Pinkie left shortly thereafter. Low returned from work between 6:00-6:30 p.m. and asked if Pinkie had been told. He was told that she had been informed. He ate his supper, changed his clothes, and left. About 7:00 p.m. Pinkie came down to the apartment for a short visit and then left. Kathy never saw her again. Low returned between 9:00-9:30 p.m., spoke with Gerrie in the kitchen, and after a few minutes he again left. Kathy did not see him again until the following day. A few days later, Pokini and Frank Melandre came to visit Low at the apartment while he was eating his dinner. They sat at the table talking, and Kathy overheard Pokini say that "he had tortured her [Pinkie], made her bed for life." Kathy West left Hawaii at the end of March because she was scared of "[t]he whole thing, all the guys." She went to live in New York City, and came back to Hawaii only in response to a subpoena to testify.

Phillip Silva testified that in March of 1972, the defendant was a visitor to his Spencer Street apartment. In the course of their conversation, Silva asked Pokini about the McCoy incident and why she was killed. Silva testified that Pokini burst out laughing and went on to describe in short but gory detail the circumstances and the manner in which Pokini and Low had killed McCoy. The nature of the mortal wounds inflicted upon Pinkie McCoy, as testified to and described by the medical examiner, was entirely consistent with Pokini's description to Silva of the homicide.

The foregoing testimony of these other prosecution witnesses was evidence corroborative of Low's testimony, and in themselves constituted independent evidence of the defendant's complicity in the offense. Low himself was subjected to a searching cross-examination by the defense, and his extensive criminal background and the inducements for his testimony were laid out before the jury. But vital to our determination in this case is that the record clearly shows that Gerrie Durant did not accompany Low the night Pinkie McCoy was taken to an isolated beach area on the other side of the island, where she was bludgeoned to death and buried in a sandy unmarked grave. Gerrie Durant at the time was in their apartment on Makiki Street, presumably still convalescing from a recent hysterectomy operation. The direct testimony of Kathy West, and the record as a whole, supports this conclusion. The tenor and effect of the cross-examination of Miss West was to negate Durant's presence and active participation in the offense and merely served to reinforce this conclusion.[1]

---

[1] The following excerpts from the record is indicative of the tenor of the defense examination:

Q. And who told Pinkie to meet Low at 7:30 that night?
A. Gerrie and I.
Q. You both told her?
A. Yes.
Q. Well, did you tell Pinkie McCoy to meet Bobby Low 7:30 that night?
A. Yes.
Q. Why did you tell Pinkie McCoy that?
A. Because this is what Bobby wanted us to do.

\* \* \* \*

Error is not to be viewed in isolation and considered purely in the abstract. *Johnson v. United States*, 318 U.S. 189, 202 (1943) (Frankfurter, J., concurring). It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes, whether there is a reasonable possibility that the error might have contributed to the conviction. *Fahy v. Connecticut, supra*. We are satisfied that in the particular circumstances of this case, the assigned error did not infect the verdict.

The judgment and sentence of the circuit court is affirmed.

*Donald K. Tsukiyama*, Public Defender, for defendant-appellant.

*George H. Yamamoto*, Deputy Prosecuting Attorney *(Maurice Sapienza*, Prosecuting Attorney) for plaintiff-appellee.

---

Q. All right, and when was the first time that you saw Bobby Low on that day?
A. He came home for lunch from work.
Q. Was there any conversation about Pinkie McCoy at that time?
A. Yes, there was. That's when he told Gerrie to have her meet him.
Q. You were present then?
A. Yes.
Q. Was anything else said by Bobby Low?
A. That Poki and he were taking her for a ride.