STATE OF HAWAII, Plaintiff-Appellee, *v.* MORONI MANULANI NAPEAHI, Defendant-Appellant

NO. 5867

NOVEMBER 12, 1976

RICHARDSON, C.J., KOBAYASHI. OGATA, MENOR and KIDWELL, JJ.

OPINION OF THE COURT BY KOBAYASHI, J.

This is an appeal by Moroni Manulani Napeahi (defendant) from a judgment of conviction, after being tried to a jury, of murder, attempted murder, and of robbery in the first degree on two counts.

For reasons stated below, we affirm defendant's convictions of murder and attempted murder, but reverse defendant's convictions of the two counts of robbery in the first degree.

ISSUES

The questions presented by the appeal are: (1) in reference to the conviction for murder, whether the trial court erred in excluding a prior inconsistent statement attributed to a material prosecution witness; (2) in reference to the convictions of robbery in the first degree, whether the trial court erred in instructing the jury that, as a matter of law, the pellet and b-b shot pistols introduced into evidence were "dangerous instruments" within the meaning of the law of robbery in the first degree.

STATEMENT OF THE CASE

On September 11, 1974, about 7:30 p.m., the defendant and his companion, Clifford Kam (Kam),[1] entered Floyds of Hawaii, a retail musical instrument and typewriter repair store located in Kailua, Oahu. The defendant proceeded towards the backroom of the store where the owner, Royal H. Lavelee (hereinafter son), and his father, Royal E. Lavelee (hereinafter father), were present. Kam remained in the retail portion of the store with Robert Rackley (Rackley), a part-time sales clerk for Floyds of Hawaii. Upon seeing the defendant push the father down, Rackley proceeded towards the back room but was ordered to stop by Kam. Because Rackley observed the defendant with a pistol pointed in the direction of the father, he acquiesced to Kam's order to stop. Kam demanded money from Rackley and a struggle ensued between them. Immediately following this struggle, Rackley encountered Paxton Haili (Haili),[2] a friend of the defendant and Kam and who had entered the store from the rear. After a brief struggle with Haili, Rackley fled and called the police from a nearby service station.

---

[1] Clifford Kam was charged with two offenses of robbery in the first degree. He entered a plea of guilty to a reduced charge on one offense, while the State entered a nolle prosequi on the second charge.

[2] Paxton Haili, the owner of the two pistols subsequently introduced into evidence, was given immunity and testified for the State.

When the defendant entered the back room he was brandishing what appeared to be an "Army .45 Caliber" type pistol. The defendant told the father and son: "This is a hold up. This is a gun. It works and I'll use it. Do as I say." Angered by the lack of money in his victims' wallets, the defendant reached for a screwdriver which was on a workbench, located near the son, and started stabbing the son with the screwdriver and at the same time striking him with the pistol. The son received multiple stab wounds and was critically injured. His father also received multiple stab wounds and died as a result of a stab wound to the heart.

Dr. Alvin Majoska, forensic pathologist, testified that the stab wound, which caused the death of the father, was consistent with having been inflicted by the type of screwdriver introduced into evidence. The son identified the screwdriver as the one used by the defendant. A b-b shot pistol resembling an Army .45 caliber and a pellet pistol referred to as a "cowboy pistol" were also introduced into evidence by the prosecution without objection.[3] Haili testified that he had given the b-b shot pistol resembling the Army .45 caliber to the defendant immediately prior to the incident at Floyds of Hawaii.

OPINION

### DID THE TRIAL COURT ERR IN EXCLUDING A PRIOR INCONSISTENT STATMENT ATTRIBUTED TO A MATERIAL PROSECUTION WITNESS?

At trial the son, a material prosecution witness, not only positively identified the defendant as his assailant but also

---

[3] Although two pistols were introduced into evidence, the record is totally devoid of any reference to the pellet pistol in regard to the offenses committed at Floyds of Hawaii. This being so, any reference to the pistol used will be limited to that of the b-b shot pistol resembling an "Army .45 caliber."

testified in detail as to what occurred between his father and the defendant:

Q. (By the Prosecution) Now, what then happened after the defendant started striking you with the gun in one hand and the screwdriver in the other hand; what if anything happened?

A. After he struck me a number of times, I was aware of my father's arms reaching out and grabbing him from the rear and pulling him away from me.

Q. And what if anything was your father saying?

A. He was telling him, "There's no need to hurt anyone. Take the money and go." He mentioned this about three times in a row.

Q. What if anything happened then?

A. The next view I had of the two while they were facing each other, my father had his arms outstretched as if holding him away, still making those statements that I just mentioned.

. . . .

Q. Now, what — would you describe the activity between your father and the defendant that occurred that you observed?

A. As I mentioned, I saw my father holding his arms outstretched as if holding him away or breaking up a fight. And I saw the defendant swinging at him with both his arms.

Q. Then what if anything do you recall next happened?

A. I had risen to my — upright on my knees at this point by holding to the shelf, Shelf No. 1. I made the remark, "Please don't kill him." And I momentarily passed out. I fell back on the floor.

. . . .

Q. Okay, now, what was the next thing that you recall happening?

A. I woke again, lying face down on my stomach on the floor. . . . I turned my head to the side and I saw my father lying on the floor very still, not moving.

On cross-examination defense counsel attempted to lay the foundation for an alleged prior inconsistent statement of the son relative to what occurred between the defendant and the father:

Q. . . . Now, Mr. Lavelee [the son], as a result of this incident at Floyds of Hawaii, it is correct, is it not, that you were interviewed and gave statements to several police officers, is that correct, in the course of their investigation of the incident?

A. One police officer.

Q. Okay, do you recall that this interview with the police officer happened or occurred at the hospital, Castle Memorial Hospital?

A. Yes.

Q. Do you recall the date this interview happened?

A. No, I would say it was probably about four or five days after the incident.

Q. Do you recall who the officer or detective was?

A. Detective Kruse.

Q. George Kruse?

A. Yes.

Q. If Detective Kruse in his report of this incident stated that on September 18, 1974, at about 8:30 a.m., while you were at the hospital, Castle, he interviewed you, would this probably be correct?

A. Yes.

. . . .

Q. Okay, do you recall him asking you questions and you making statements throughout?

A. Yes.

Q. Okay, would it be correct to say that you gave a detailed statement or you talked quite at length in this course?

A. I gave a general statement.

Q. Do you recall stating to Detective Kruse that you had no idea what happened to your father prior to seeing him laying on the floor in the shop next to him, that you could not recall hearing [your] father talking and was

struggling with the gunman? Do you recall making that statement?

A. I recall telling him what my father had said to the attacker, and also saying that I did not see what happened to my father.

Q. Do you recall making the statement that I said that you stated —

A. Well, you have said in that statement that my father did not say anything. I don't recall making this statement to the detective, I seem to recall that I did tell him that my father did make some statement to him as he pulled him off of me.

Thereafter, in order to impeach the credibility of the son, the defendant sought to introduce the prior inconsistent statement by way of testimony of Detective George Kruse.[4] However, the trial court disallowed the introduction thereof. The prosecution in its brief on appeal contends that the trial court did not err in its ruling because the son did not deny making the statement and "his testimony in court [was not] directly contradictory and inconsistent with the statement sought to be introduced."

We are of the opinion that the record herein shows that defendant had sufficiently complied with the statutory requirements of HRS § 621-23.[5] *State v. Pokini*, 57 Haw. 26, 548 P.2d 1402 (1976). *Pokini*, as in the instant case, dealt with the

---

[4] In questioning Detective Kruse, defense counsel did not ask any question the answer to which would have placed before the jury any prior statement by the son. The questions to which the trial court sustained objections sought to ascertain whether Detective Kruse had determined from the interview whether the son recalled hearing his father talking or struggling with the gunman or knew what had happened to his father. Thus we do not have the allegedly inconsistent statement before us and might have doubt that the trial court ever refused to admit it. While we accept the issue as tendered by the briefs, the absence of the allegedly inconsistent statement from the record weakens the argument that its exclusion was prejudicial error.

[5] HRS §621-23. *Former inconsistent statements.*

If a witness upon cross-examination as to a former statement made by him relative to the subject matter of the cause or prosecution and inconsistent with his present testimony, does not distinctly admit that he has made the statement,

foundational requirement and admissibility of a prior inconsistent statement made by a key prosecution witness. We expressly held therein that: "Where the circumstances accompanying the making of the supposed statement have been called to the attention of the witness upon cross-examination, and he denies having made the statement, or fails to admit it distinctly, or says that he does not remember, the foundation requirements for the impeaching evidence have been satisfied." *Id.* at 29, 548 P.2d at 1405. We further stated in *Pokini* that "The foundation requirement is for the purpose of rekindling the witness' memory, and substantial compliance is all that is necessary." *Id.* at 29, 548 P.2d at 1405.

Thus, the trial court erred in excluding the prior inconsistent statement attributed to the son, a material prosecution witness. *State v. Pokini, supra.*

It is incumbent upon this court now to determine whether the exclusion of such testimony amounted to prejudicial error. *State v. Pokini, supra.*

In *Pokini, supra,* we concluded that the exclusion of competent testimony designed to impeach the credibility of a material witness for the State was error that infringed upon a constitutional right of the accused. Though we did not in *Pokini* specify which constitutional right was infringed upon, it is clear that the right of an accused to be convicted only upon proof by the prosecution of all of the elements of the crime charged against him beyond a reasonable doubt is a constitutionally protected right. *In re Winship,* 397 U.S. 358, 364 (1970); *State v. Cuevas,* 53 Haw. 110, 115, 488 P.2d 322, 325 (1971). Further, it is elementary that the right of an accused to confront witnesses against him is a constitutionally protected right. *Pointer v. Texas,* 380 U.S. 400 (1965); *Alford v. United States,* 282 U.S. 687 (1931).

We believe that, in a criminal case, implicit in defendant's right to confront witnesses against him, is his

proof may be given that he did in fact make it; but before such proof can be given the circumstances of the supposed statement sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he has made the statement.

right to cross-examine and to impeach the confronted witness. *Davis v. Alaska,* 415 U.S. 308 (1974); *Douglas v. Alabama,* 380 U.S. 415 (1965); *Pointer v. Texas,* 380 U.S. 400 (1965); *Mattox v. United States,* 156 U.S. 237 (1895); *State v. Hashimoto,* 47 Haw. 185, 389 P.2d 146 (1963); *Territory v. Gusman,* 36 Haw. 42 (1942); *Wigmore on Evidence,* vol. 5, § 1365 (1974).

When an error which is challenged on appeal constitutes an infraction of a substantial constitutional right of the accused, the error will rarely be considered harmless error.[6] *Chapman v. California,* 386 U.S. 18, 23 (1967), *State v. Pokini, supra; State v. Cuevas, supra.* However, the United States Supreme Court recognized that "there may be some constitutional errors which in the setting of a particular case are so unimportant and so insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal of the conviction." *Chapman v. California, supra* at 22. But before such a constitutional error will in fact be held harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt", *id.* at 24; *State v. Cuevas, supra; State v. Pokini, supra,* for if there is a "reasonable possibility" that the matter complained of "might have contributed to the conviction", the error must give rise to a reversal. *Fahy v. Connecticut,* 375 U.S. 85, 86-87 (1963); *see State v. Pokini,* 55 Haw. 640, 646, 526 P.2d 94, 101 (1974); *State v. Kahinu,* 53 Haw. 536, 550, 498 P.2d 635, 644 (1972).

The defendant does not contend, nor do we find, that the supposed prior inconsistent statement infected all of the convictions. The defense, however, submits that there was prejudicial error as to his convictions of murder and of attempted murder in that there was no other evidence, other than the testimony of the son, leading to the complicity of the defendant in the murder of the father. This contention is without merit: (1) The prior inconsistent statement has no relevancy

---

[6] The Hawaii statutory harmless error rule states that any error complained of "shall be disregarded" if it "does not affect substantial rights." HRCrP 52(a).

as to defendant's conviction of attempted murder. (2) As to defendant's conviction of murder, the record shows as follows: Dr. Alvin Majoska, forensic pathologist, testified regarding the wounds received by the father and the manner in which they might have been inflicted. His findings were essentially consistent with the manner in which the son alluded in his testimony as to how his father had met his death.

Haili testified that the defendant and Kam had planned the robbery earlier that evening; that the defendant asked Haili for guns; that Haili went home and gave the b-b pistol to the defendant. Haili also testified that he saw the defendant, the son and the father in the back room and that he saw the defendant stabbing someone with a screwdriver.

James Passos (Passos), a friend of the defendant, testified that he had received a phone call from the defendant about 8:00 p.m., on September 11, 1974; that the defendant visited his home soon thereafter; and that they had a conversation relating to what had happened earlier that evening at Floyds of Hawaii:

Q. (By the Prosecution) Now, after you received the call, he [Napeahi] did come over, is that correct?

A. Right.

. . . .

Q. Okay, and what if anything happened when the defendant came?

A. He came over, he sat down and he told me, oh, what he did. And at first I thought he was just joking. You know, how he said, oh, some guy hit him with a chair and he stabbed him.

Q. Now, what did he tell you he did?

. . . .

A. Okay, you know, he sat down on the chair. And I told him, "Hey, what's the matter?" He said, "Oh, man, I blew it, man. This guy hit me and I started stabbing him.

Q. Okay, and did he indicate how many times he stabbed the person?

A. All he said was, oh, you know, "Uh, uh" that's it. A few times.

. . . .

Q. Now, did he indicate during the course of his conversation with you the number of persons?

A. *Two*.

Q. He had indicated two?

A. (Witness nodded his head in the affirmative.)

. . . .

Q. . . . Now, at the time at your residence, when he told you about having stabbed these *two guys*, did he indicate how many times he had stabbed these *two guys*?

A. He just made the motion quite a few times. You know, I just didn't count.

. . . .

Further, the defendant asked Passos to pick up a package at a pool hall near Floyds of Hawaii. Upon entering the pool hall and asking for the package, Passos was told by a person, behind a counter in the pool hall, to tell the defendant that "one of the guys died."

The foregoing testimonies of the witnesses of the prosecution, apart from the testimony of the son, constitute clear, independent, and overwhelming evidence of defendant's guilt of the murder of the father. We believe that, in the setting of the totality of this case, where the guilt of defendant is not questionable, it is not reasonably possible that the error herein contributed to defendant's conviction of murder. Thus, we are of the belief that the error is harmless beyond a reasonable doubt.

DID THE TRIAL COURT ERR IN INSTRUCTING THE JURY THAT, AS A MATTER OF LAW, THE PELLET AND B-B SHOT PISTOLS INTRODUCED INTO EVIDENCE WERE "DANGEROUS INSTRUMENTS" WITHIN THE MEANING OF THE LAW OF ROBBERY IN THE FIRST DEGREE?

In counts III and IV, the defendant was charged for robbery in the first degree, in violation of Section 708-840(1)

(b) (ii), Hawaii Penal Code. Said section, in pertinent parts, provides: "(1) A person commits the offense of robbery in the first degree if, in the course of committing theft: . . . (b) He is armed with a dangerous instrument and: . . . (ii) He threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property. (2) As used in this section, 'dangerous instrument' means any firearm, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury: (3) Robbery in the first degree is a class A felony."

In our opinion, an instrument, within the clear import of the provisions of Section 708-840, does not attain the character of a dangerous instrument unless "in the manner it [the instrument] is used or threatened to be used is capable of producing death or serious bodily injury".

The statute creates factual criteria requiring the prosecution to adduce evidence meeting the criteria. It is then clearly a question of fact for the jury to resolve whether the prosecution has proved an essential element of the crime of which defendant is tried.

In his charge to the jury, the trial judge, after initially defining a "dangerous instrument" as "any instrument, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury . . ." further instructed the jury: ". . . The Court expressly instructs the jury that as a matter of law both guns are dangerous instruments within the meaning of the law of Robbery in the First Degree."

The first instruction correctly informed the jury of the test to be used in determining whether the pistols were in fact "dangerous instruments" as used in determining robbery in the first degree. The second instruction took this question of fact from the jury and erroneously directed them as a matter of law that if they found that the defendant was armed with

the pistol in question, the robbery would be one of first degree.

The "[q]uestion on review of instructions is not whether they were technically correct, but whether defendant could have suffered prejudice on their account." [Citations omitted] *State v. Travis*, 45 Haw. 435, 438, 368 P.2d 883, 885 (1962). " 'In determining the sufficiency of a particular instruction, or part of a charge, it is not to be considered apart from its context, or the rest of the charge. Both in civil and in criminal cases the instructions of the court must be read together as one connected whole, to ascertain whether they correctly declare the law. The omissions or inaccuracies of one instruction may be cured by the contents of the other instructions, or some of them, and if, when the instructions of the court are considered as a whole, they correctly state the law and are not inconsistent or misleading, the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal.' . . ." *Id.* at 438, 368 P.2d at 886.

In applying the above standard we are of the opinion that the trial court committed reversible error affecting counts III and IV, respectively. The instruction of the trial court was unfair and prejudicial to the defendant and was not cured by any other instruction given at trial. *See State v. Travis, supra*.[7] An erroneous instruction, clearly prejudicial cannot be cured by another instruction which correctly states the law, but does not call the attention of the jury to the erroneous instruction. *Territory v. Kaeha*, 24 Haw. 467 (1918).

By entering a plea of not guilty, the defendant put in issue all of the material allegations of the indictment and cast upon the State the burden of proving beyond a reasonable doubt each and all of such material allegations before the defendant may be found guilty of the crime charged. *See State v. Hale*,

---

[7] Further, we note that Section 708-841, robbery in the second degree, a class B felony, does not require the proof of the use of a dangerous instrument by the offender. And the sentence for conviction of a class A felony is life; and the sentence for conviction of a class B felony is twenty years.

45 Haw. 269, 367 P.2d 81 (1961); *Hawaii Penal Code* Section 701-114; *Byrd v. United States,* 119 U.S. App. D.C. 360, 342 F.2d 939 (1965). The defendant's absolute right to a jury determination upon all essential elements of the offense emanates from his constitutional right to a trial by jury. *See United States v. England,* 347 F.2d 425 (7th Cir. 1965), 50 C.J.S. § 130.

*Rogers M. Ikenaga (Ikenaga, Pyun & Ito* of counsel) for defendant-appellant.

*Lydia Garcia,* Deputy Prosecuting Attorney *(Maurice Sapienza,* Prosecuting Attorney, with her on the brief) for plaintiff-appellee.