STATE OF HAWAII, Plaintiff-Appellee, *v.* LIUAFI LIUAFI, JR., also known as Junior Liu Matatia, Defendant-Appellant

NO. 7562

FEBRUARY 18, 1981

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY BURNS, J.

Liuafi Liuafi, Jr., (hereinafter Liuafi) appeals from a conviction of attempted murder, in violation of Hawaii Revised Statutes (HRS) §§ 705-500 (1976) and 707-701 (1976), and of failure to render assistance, in violation of HRS § 291C-12 (1976). He alleges that (1) the trial court committed reversible error in not allowing defense counsel to cross-examine the complaining witness regarding a possible civil suit against Liuafi; (2) the trial court erred in admitting into evidence the results of a breath test without a proper foundation; (3) the trial court erred in finding that Liuafi had waived his rights to counsel and to remain silent; (4) it was unconstitutional to prosecute Liuafi for failure to render assistance; (5) it was error to convict Liuafi of both offenses; and (6) it was error not to instruct the jury on state of mind as an element of the offense of failure to render assistance.

*  *  *  *  *

According to the testimony of the State's complaining witness, Donald Hoover, the incident in question happened as follows. Hoover, a 23-year-old Canadian tourist, went to the Sizzler Steak House at Kalakaua Avenue and Ala Moana Boulevard a little after 12:30 a.m. on January 12, 1979, to get some food to bring back to his hotel room. Carrying the food,

he left the restaurant and started to walk across the rectangular parking lot toward his hotel. When he was about eight feet into the parking lot, a fast moving car pulled up in front of him. The driver yelled at him and said something like, "Look out, ass hole, or I'll run you over." Hoover identified Liuafi as the driver. Hoover ignored the comment and walked around the side of the car. As he got to the back of the car, somebody in the car yelled out, "Hey, come back here." Hoover walked back to the passenger side of the car and somebody inside asked, "Would you like to buy some dope." Hoover laughed and answered, "I got some" and started walking back past the back of the car. When he got about ten feet behind the car, the driver jumped out, came toward him and started yelling at him. Another person got out from the passenger side of the car. Hoover, by then thinking that he was going to be beaten, was trying to make up his mind whether to fight back or just to run. He was turning to leave when he was struck. The food fell. He was hit again and fell. Then there were a couple of people kicking him. He covered up his head. He didn't know how long he was kicked. He was left lying there. He heard the car door slam. He got up on his knees. He was ten to fifteen feet behind the car with his back to it. He was going to crawl between some parked cars. Looking over his shoulder, he saw the backup lights of the car turn on. The car, moving backward, hit him in the back. He went underneath the car, which did not continue backward in a straight line, but rather inscribed a tight half-circle, so that at the end of its arc, the front of the car was facing very nearly opposite its original direction. The car passed over Hoover so that when it stopped its backward circular movement, he was facing the front of the car, positioned between the car and the driveway, which exits onto Ala Moana Boulevard. Hoover tried to crawl away, but his legs would not work properly. He thought that he had been run over by accident and that his assailants were just in a hurry to get away. So he got up on his knees, put his hand over his head and started waving at the car. The car came straight at him, striking him in the chest. He was on his knees at the time. He went down underneath the car. He thought he had blacked out momen-

tarily at that point. When he "sort of [came] to", the tire of the car on the passenger side was coming straight for his face. He reached up and got hold of the side of the door of the car and pulled himself up. He tried to pull himself out from under the car but there wasn't time. He put one arm down across his chest and the tire pinned his arm and his chest. The tire didn't go over him. The other tire seemed to go spinning on the loose rocks on the pavement, but the one he was pinned under did not. The car stopped and backed up a little. The car went ahead again. It dragged him across the parking lot and out onto Ala Moana Boulevard. While he was being dragged, one arm was "hung up on something"; he couldn't get it loose. When the car went down the driveway onto the street, his arm came loose. He started rolling and came out rolling from behind the car. He ended up in the middle of the street. One shoe was gone. He did not have any clothes on his chest. He was lying on the pavement. He brought his knees up to his chest and managed to get up on his knees. He could not move any further.

On cross-examination, Hoover agreed that in a three-page written statement prepared on January 23, 1979, he had not mentioned the waving of his hand above his head prior to the second impact. He also agreed that his testimony about these events might contain a mistake, but said that he could not be mistaken about being run over twice.

Also on cross-examination, defense counsel attempted to elicit information from Hoover as to whether he had contemplated and/or filed a civil suit against Liuafi. The trial court sustained the prosecution's objection and disallowed this line of cross-examination:

> Mr. Ito [defense counsel]: Mr. Hoover, isn't it true, that when you gave this statement on January 23, 1979, that you had already retained the private attorney to sue Mr. Liuafi?
>
> Mr. Nakamura [prosecutor]: Objection, your honor. Irrelevant.
>
> The Court: Objection is sustained.
>
> Mr. Ito: Your honor, may we approach the bench?
>
> The Court: Yes.

. (Bench conference with reporter present).

Mr. Ito: Your Honor, I believe I can go into this collateral area to show bias by the witness. If there is another pending lawsuit; I think that it's proper to go into this area because he does have a financial interest in the outcome of the case.

The Court: What is the connection as far as was the attorney present when this statement was made or . . .

Mr. Ito: A representative from his office was present when the statement was made, not Mr. S[c]hutter himself, but a representative from his office, who was a paralegal.

The Court: Well, unless it can show a clear basis or relevance, at this point, I won't permit this testimony regarding any other lawsuit.

Mr. Ito: O.K. Thank you.

Liuafi asserts that the trial court erred in precluding cross-examination of Hoover as to a civil suit against Liuafi arising out of the same incident giving rise to the criminal prosecution. He argues that a witness's potential financial interest in the outcome of a criminal case is probative of bias and therefore credibility.

The State responds by contending that the trial court was within its discretion in denying Liuafi the opportunity to pursue the above line of questioning because the offer of proof was legally insufficient. The State argues that because Liuafi failed to offer and prove the proposition that the judgment of a criminal conviction is admissible evidence in a subsequent civil action arising out of the same transaction,[1] Liuafi did not satisfy the rule of law that an offer of proof, properly presented, should inform the court of the legal theory under which the evidence offered is admissible, citing *Mad River Orchard, Inc. v. Krack Corp.*, 89 Wash. 2d 535, 536, 573 P.2d 796, 797 (1978).

---

[1] In Hawaii, a judgment of criminal conviction is admissible in such a civil action, subject to three conditions not relevant here. *See Asato v. Furtado*, 52 Haw. 284, 289-292, 474 P.2d 288, 293-294 (1970).

We believe that the offer of proof was sufficient and that it was error not to allow the witness to answer the question. The credibility of a prosecuting witness in a criminal case is always relevant, and cross-examination directed toward revealing possible biases, prejudices or ulterior motives of the witness is a proper and important function of the constitutionally protected right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). *See Smith v. State of Illinois*, 390 U.S. 129 (1968) and *Alford v. United States*, 282 U.S. 687 (1931).

"An offer of proof cannot be denied as remote or speculative because it does not cover every fact necessary to prove the issue. If it be an appropriate link in the chain of proof, that is enough." *McCandless v. United States*, 298 U.S. 342 (1953). The offer was to prove financial bias, and under the cases cited, we believe that was sufficient.

Concluding that the trial court erred in not allowing the defense to question Hoover regarding bias does not end our inquiry. Not all errors require reversal. A constitutional error is ground for reversal, unless the reviewing court is able to conclude, from the record as a whole, that the error was harmless beyond a reasonable doubt. *State v. Pokini*, 57 Haw. 26, 548 P.2d 1402 (1976), and cases cited at 57 Haw. 29.

> Errror is not to be viewed in isolation and considered purely in the abstract. *Johnson v. United States*, 318 U.S. 189, 202 (1943) (Frankfurter, J., concurring). It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes, whether there is a reasonable possibility that the error might have contributed to the conviction.

(Citation omitted.) *Id.* at 34, 548 P.2d at 1402.

We turn, then, to an examination of the evidence exclusive of the testimony of the victim, Donald Hoover.

There were two other eyewitnesses to most of the sequence of events Hoover described. The first of these to testify was Irene Raven of Edmunton, Canada. She testified as follows. She and a friend were walking along the Pearl

Harbor side of Ala Moana Boulevard towards Kalakaua at about 1:15 a.m. on January 12, 1979. As they reached the driveway of the Sizzler Steak House parking lot on Ala Moana, Ms. Raven saw two men in the parking lot. One man was lying immobile on the ground on his left side, arms over his head as if to protect himself. He was being kicked "severely" by the other man, "to the point that we were horrified". The man doing the kicking appeared to be about 5 feet 10 inches tall. Relatively poor lighting conditions in the parking lot prevented a clear look at the kicking man's face, but his silhouette was discernible. He was wearing heavy boots.

Ms. Raven and her friend felt that they could not get involved. They continued along the sidewalk in the same direction, observing the events in the lot as they walked. A short distance before they drew parallel to the restaurant door, Ms. Raven saw the kicking man get into the driver's seat of a car, the rear end of which was facing them, and the door of which was already opened. The car was occupied by three other persons (one in the front, two in the back) and was positioned parallel to Kalakaua, very close to the wall of the restaurant. The car was not in a parking stall. Directly in front of the car was a white van. Just before the kicking man got into the car, the van sped out of the parking lot, going nowhere near the man on the ground. Ms. Raven had no feeling of fear that the van would hit the prone man.

After the kicking man got into the car, Ms. Raven saw the wheels of the car turn "in the path right in the direction" of the prone man. Ms. Raven said to her friend, "Just watch, he is going to run over this boy." Believing that, Ms. Raven ran into the parking lot from the sidewalk to get the license plate number of the car. The car moved across the parking lot at a speed she estimated at 15 miles per hour and headed onto Ala Moana. The victim was no longer lying where he had been. She glanced out to the boulevard and saw him lying there. Although there may have been other cars in the parking lot, there were none in any position that would have impaired either the driver's view of the victim, or Ms. Raven's. She testified that the prone victim's body was clearly visible in the parking lot before it was struck. The car never backed up,

stopped, or swerved. Once it started to move, it moved forward in one continuous motion.

The second eyewitness was Lorna Perry, Ms. Raven's friend, also from Edmunton, Canada. She testified as follows. While walking along the Pearl Harbor side of Ala Moana Boulevard toward Kalakaua in the early morning hours of January 12, 1979, she and Ms. Raven came upon the scene of a beating. Just after passing by the wall abutting the side of the parking lot farthest from the Sizzler Steak House, Ms. Perry saw the victim lying on the ground. Standing over him, kicking him in the face, the chest and the upper part of the body was a man, seen in silhouette, wearing very heavy boots of a light color, tight jeans rolled up a bit, and a short jacket with stripes running down the sides. Ms. Perry identified Liuafi as the kicking man.

When the women first came by the wall, Ms. Perry was aware of two other males running toward a car parked behind a van. Ms. Perry placed the car in the same location and facing in the same direction as had Ms. Raven.

After he was finished kicking, Liuafi turned toward the van, raised his hand over his head, and ran to the car. Before Liuafi reached the car, the van had started to move.

Liuafi got into the car, the door of which was already opened, and drove "in a tight circle back and towards where the victim was laying on the ground and ran over him, and the body stayed with the car, which was then lost from the car out here in the boulevard". The car traveled fast for the location [i.e., the parking lot], between ten and fifteen miles per hour. Again corroborating Ms. Raven's testimony, Ms. Perry said that the car did not move until Liuafi jumped in. Once it moved, it moved in a continuous forward motion, without stopping, speeding up when it exited onto the boulevard.

The treating physician at Kaiser Hospital testified that Hoover, when brought in by ambulance face down on a stretcher, had: tire tread marks across the small of his back; three lacerations, two on the back of his head, one on his left lower back; multiple abrasions from his buttocks to his shoulders; a fracture of his left ankle; and three fractures in his backbone.

Officer Brian Lee of the Honolulu Police Department testified that he had administered a breathalyzer test to Liuafi between 1:42 a.m. and 2:00 a.m. on January 12, 1979. State's Exhibit 10 in evidence is a copy of a Breathalizer Operation Checklist completed by Officer Lee. It contains the result of the breathalyzer test: a blood alcohol content of .12 percent. In the course of administering the test, Officer Lee observed that Liuafi's motor skills (walking and other physical movement) appeared normal, his eyes bloodshot, his speech slurred, and his breath smelled of alcohol at a distance of three feet.

Steven Ugelow, a physician on duty at Kaiser Hospital Emergency Room when the victim was brought in, testified as an expert regarding the effect of a .12 percent blood alcohol content. He said that nondrinkers would be "slightly drunk, a little happy"; would be able to walk around, know where they are and what is happening; would be able to tell right from wrong, to speak, see and hear; would be lucid; and might or might not have trouble walking a straight line. Dr. Ugelow said that a .12 percent concentration in a regular drinker would have "practically no effect at all".

The State also introduced two sets of photographs of the Sizzler parking lot, through the testimony of Shin Tak Lam and Deanne Afualo, police evidence specialists. Mr. Lam took a series of photographs at approximately 3:00 a.m. on January 12, 1979, including several showing a carry-out container of food, with its contents splattered, in the parking stall closest to the driveway on the Ala Moana side of the lot.

The other set of photographs was taken by Ms. Afualo in daylight later on January 12. They show Detective James Griffen standing in the spot where Liuafi told the detective the victim was standing when the car Liuafi was driving entered the lot. One photograph also shows Liuafi, who is wearing dark pants, a dark outer garment with stripes on the arms, and footwear of a light color. These clothes are the clothes Liuafi was wearing when he was arrested.

Detective Griffen testified regarding statements Liuafi had made to the detective on the afternoon of January 12, 1979. After being advised of his rights and agreeing to give his

version of the incident, Liuafi told the detective that he had been with three other people and that the four of them had consumed about five cases of beer in the Sizzler Steak House parking lot in Waikiki. Then they left the area. A person had walked in front of the car. Liuafi hollered at him to get out of the way. He said he may have run him over. He was not sure. He was drunk.

In a second version taken at the same time, Liuafi told the detective that he had driven into the parking lot, a "white guy" had been walking toward him, he may have run him over, but he was not sure, and he continued out of the parking lot, never having stopped. Liuafi said that if he had run over the man, it was on his way out of the lot. In the photographs, the position in which Liuafi placed the detective is in the lane (between two rows of parking stalls) intended for cars entering the lot: the stalls are angled to allow for an easy turn into them by a car moving toward the restaurant from the (only) driveway.

Kathryn Bob, evidence specialist, and Milton Chang, criminalist, testified regarding a hair sample obtained from the edge of the bell housing under the car Liuafi was driving when arrested. Mr. Chang testified that microscopic analysis revealed that the hair recovered from the car had qualities consistent with Donald Hoover's hair, a sample of which was obtained from him. The two hair samples had similar physical characteristics in the appearance of the cuticle (the outside covering of the hair) and the medulla (the inner portion of the hair).

Photographs of the undercarriage of the car introduced into evidence show that portions of the gas tank, the steering linkage and the cross member appear cleaner than adjacent portions, as if rubbed clean. The front of the car, a 1965 Mustang, bears dents adjacent to both sides of the license plate.

Cheryl McDaniel, Liuafi's girl friend, testified that the 1965 Mustang was hers and that Liuafi had the car on January 11 and 12, 1979.

Liuafi was arrested by Honolulu Police Department Sergeant Gary Winterbottom. Sgt. Winterbottom testified that

while on duty in a plainclothes unit assigned to downtown Honolulu, he received an all points bulletin (APB) between 1:15 and 1:20 a.m. on January 12, 1979 on a vehicle and its occupants in connection with an "assault type case and a leaving the scene of an accident case". Then another police unit indicated that the vehicle was in sight. Winterbottom intercepted and stopped the Ford Mustang, which matched the APB description, on Richards Street between Hotel and King. There was no resistance. The sergeant's observations of Liuafi, whom he observed "closely", were that he had an alcoholic breath, appeared to be steady on his feet, understood what he was asked, was polite and was easy to talk to.

Liuafi, who did not testify, presented one witness: Naseri Mao, his cousin, who was with Liuafi after about 4:30 p.m. on January 11, 1979. He testified that when he returned home from work at that time, Liuafi and two men named John and Jack were at his house drinking beer. He did not know how much they drank. At about 10 p.m. they all left and went in Liuafi's car to Sizzler's Dillingham, where Liuafi was employed. They stayed in the parking lot at that location for several hours drinking beer with some of the employees. When they left Sizzler's Dillingham, Liuafi drove. Liuafi said they were going to get a sandwich for "some girl". The next thing Mao remembered was being arrested.

Liuafi was convicted of attempted murder. HRS §§ 705-500(1)(b) (1976) and 707-701 (1976) provide that a person is guilty of attempted murder if he intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime of murder.

Careful review of the record in this case convinces us that the trial court's error in limiting the cross-examination of Hoover did not and could not reasonably have contributed to Liuafi's conviction for attempted murder. The testimonies of the other witnesses, especially Irene Raven and Lorna Perry, together with the physical evidence, constitute clear, independent, and overwhelming evidence of Liuafi's guilt of the attempted murder of Hoover. *See State v. Napeahi*, 57 Haw.

365, 375, 556 P.2d 569, 575 (1976). We believe and hold that the error was harmless beyond a reasonable doubt.

Liuafi asserts that the trial court erred in admitting into evidence the results of the breathalyzer test performed by Officer Lee following Liuafi's arrest. He argues that there was an inadequate foundation for the introduction of the results because the State failed to show compliance with Department of Health regulations regarding the repair, maintenance and testing for accuracy of breath testing instruments. The State contends that compliance was shown and that any deficiences go to the weight given to, not the admissibility of, the test results.

The regulations at issue are contained in Public Health Regulations (hereinafter PHR) chapter 47 (Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration) of the Department of Health, State of Hawaii. The regulations were promulgated pursuant to the provisions of HRS § 321-161 (1976) and HRS chapter 91, and became effective June 2, 1975.

HRS § 321-161 provides, in pertinent part, that:

[§ 321-161] Chemical testing for blood alcohol concentration. (a) The department of health shall establish and administer a statewide program relating to chemical testing of blood-alcohol concentrations for the purposes of chapter 286, part VII, and chapters 291 and 291C, with the consultation of the state highway safety coordinator. Under the program, appropriate procedures shall be established for specifying:

(1) The qualifications of personnel who administer chemical tests used to determine blood alcohol concentrations;

(2) The procedures for specimen selection, collection, handling, and analysis; and

(3) The manner of reporting and tabulation of the results.

(b) The director of health may adopt rules and regulations pursuant to chapter 91 necessary for the purposes of this section. [L 1973, c 139, § 1]

In accordance with the maxim *espressio unius est exclusio alterius*,[2] we believe that the specificity of the legislative enumeration in this section means that the PHR regulations are applicable only to the proceedings enumerated.

In *State v. Parker*, S.C., 245 S.E.2d 904, 906 (1978), the South Carolina Supreme Court affirmed the trial court's admission into evidence of breathalyzer results over defendant/appellant's objection that an inadequate foundation had been laid. The *Parker* court followed with approval foundational requirements for the admission of breathalyzer results set forth in *State v. Baker*, 56 Wash.2d 846, 355 P.2d 806 (1960), and stated that the necessary foundation for admission was a showing by the State (1) that the machine was in proper working order at the time of the test; (2) that the correct chemicals were used; (3) that the accused was not allowed to put anything in his mouth for 20[3] minutes prior to the test; and (4) that the test was administered by a qualified person in the proper manner. *Parker, supra*, 245 S.E.2d at 906.

Applying these foundational requirements, the *Parker* court reasoned that the testimony of the breathalyzer machine operator that he had run a simulator test immediately before the actual test, and that the breathalyzer machine gave a reading equal to the percent of alcohol in the simulator solutions, was sufficient to establish, *prima facie*, that the machine was working properly and that the correct chemicals were used. *Id*. If there is evidence challenging the *prima facie* showing made, the judge must rule on admissibility in light of all evidence presented. *Id*.

Liuafi cites no factual or legal authority to show that the simulator test performed by Officer Lee is a less reliable indication that the machine was in proper working order than the periodic testing for accuracy that was not shown to have

---

[2] Definition from BLACK'S LAW DICTIONARY 521 (5th ed. 1979):

A maxim of statutory interpretation meaning that the expression of one thing is the exclusion of another.

[3] *State v. Baker, supra*, requires a 15-minute waiting period. *See Parker, supra*, 245 S.E.2d at 906, n.3.

been performed, or to show that the simulator test is unreliable standing alone.

We hold that when the State seeks to introduce into evidence the results of a breathalyzer test in a chemical prosecution outside the ambit of HRS § 321-161 (1976), it must establish as a foundation that (1) the machine was in proper working order at the time of the test; (2) the correct chemicals were used; (3) the accused was not allowed to put anything in his mouth for 15 minutes prior to the test; and (4) the test was administered by a qualified person in the proper manner.

The only factual difference between this case and *Parker, supra,* is that in the latter, the simulator test was administered prior to the actual test, while here it was done afterward. We think the difference inconsequential. We hold that Officer Lee's testimony that the simulator test he performed yielded the expected reading was sufficient to establish *prima facie* that the machine was in proper working order and that the correct chemicals were used. *Accord, Parker, supra.*

Before trial, Liuafi unsuccessfully moved to suppress the statements he made to Detective Griffin following his arrest. He claimed that he had not effectively waived his rights to counsel and to remain silent.[4]

The State had to show a knowing, intelligent and voluntarily relinquishment of those rights. *See Miranda, supra, Johnson v. Zerbst,* 304 U.S. 458 (1938).

The waiver was effected with the aid of H.P.D. Form 81, which contains a concise statement of applicable rights followed by pertinent questions asking whether the suspect understands those rights and agrees to waive them. Spaces are provided after each question for a "yes" or "no" answer.

*State v. Maluia,* 56 Haw. 428, 539 P.2d 1200 (1975), held that evidence that a suspect had been read H.P.D. Form 81 could be sufficient to show a valid waiver, and established the analytical framework for evaluation on a case by case basis: "The crucial test is whether the words in the context used,

---

[4] *See Miranda v. Arizona,* 384 U.S. 436 (1966), *State v. Santiago,* 53 Haw. 254, 492 P.2d 657 (1971).

considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all his rights." *Id.* at 432, 539 P.2d at 1205.

Our standard of review is prescribed by *State v. Green*, 51 Haw. 260, 457 P.2d 505 (1969):

> The trial judge has a duty to determine the admissibility of an inculpatory statement out of the presence of the jury and prior to the jury's exposure to such evidence.
>
> In order to effectuate this duty, the trial judge is vested with wide discretion to determine the credibility of the witnesses and to weigh the evidence in order to ascertain whether the prerequisites to admissibility are present.
>
> When the evidence is conflicting, with one version of the facts supporting admissibility and the other not supporting admissibility, the reviewing court may not disturb the finding of admissibility unless the defendant demonstrates that there has been a clear abuse of discretion on the part of the trial judge in the determination of admissibility.

*Id.* at 264, 457 P.2d 505 at 508.

Liuafi claimed that he did not understand the English language well enough to effectively waive his rights. However, the record shows, *inter alia,* that he obtained a driver's license, apparently in 1976, and that to do so, he had to pass a written test in English; that he was born and raised in American Samoa and took required English courses all the time he was in school; that he graduated high school; that he came to Hawaii in 1972, had worked as a dishwasher and was employed by Sizzler Steak House at the time of the events giving rise to this case; that he initialed and signed H.P.D. Form 81; and that he gave responsive answers to the questions addressed to him by both counsel at the hearing.

Liuafi testified that his ability to understand English was limited; that he had failed the written driver's license test about nine times before passing it, and that he did not understand that he could have an attorney when he responded to H.P.D. Form 81.

The evidence was conflicting. Credibility was crucial. The trial judge has wide discretion to determine credibility. *See Green, supra*. We hold that Liuafi has not clearly demonstrated that the trial court abused its discretion in denying his motion to suppress and admitting his statements at trial.

Liuafi argues that he could not be convicted of both attempted murder and failure to render assistance. His basis for this assertion is HRS § 701-109(1)(c) (1976), which provides in pertinent part:

§ 701-109 Method of prosecution when conduct establishes an element of more than one offense. (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense, the defendant may be prosecuted for each offense of which such conduct is an element. He may not, however, be convicted of more than one offense if:

\* \* \* \* \*

(c) Inconsistent findings of fact are required to establish the commission of the offenses. . . .

The inconsistency asserted is that Liuafi's conviction for attempted murder required a finding of fact that he intentionally attempted to murder Hoover by driving over him; while conviction under HRS § 291C-12 (1976) required a finding that Liuafi was the driver of a vehicle involved in an accident. He asserts that the two findings are mutually exclusive.

The State replies that because Liuafi failed to request a jury instruction to the effect that he could be convicted only of one of the two offenses charged, he cannot claim error in that regard on appeal, citing rule 30(e), Hawaii Rules of Penal Procedure (HRPP). On the merits, the State contends that Liuafi committed two separate and distinct acts and that no inconsistent findings of fact were required.

Liuafi responds to the State's procedural argument by citing rule 52(b), HRPP: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

On the procedural argument, there is case authority to support the State's position, *see State v. McNulty*, 60 Haw. 259, 588 P.2d 438 (1978), *State v. Arena*, 46 Haw. 315, 379 P.2d 594 (1963), *State v. Yoshida*, 45 Haw. 50, 361 P.2d 1032 (1961), and to support Liuafi's. *See State v. Iaukea*, 56 Haw. 343, 537 P.2d 724 (1975), *State v. Carson*, 1 Haw. App. 214, 617 P.2d 573 (1980).

In the circumstances of this case, we believe it appropriate to apply rule 52(b), HRPP, and to decide the merits of Liuafi's argument. *Cf. State v. Carson, supra.*

HRS § 291C-12 (1976) is entitled "Accidents involving death or personal injury". It is contained in Part II ("Accidents and Accident Reports") of the Statewide Traffic Code, HRS chapter 291C (1976). Section 291C-12 requires the driver of any vehicle involved in an accident resulting in injury to or death of any person to remain at the scene of the accident until he or she has fulfilled the requirement of HRS § 291C-14 (1976) to give information and render aid.

The word "accident" is not defined in the statute, although HRS § 291C-1 (1976) contains definitions of forty terms used in HRS chapter 291C. The legislative history of HRS chapter 291C (Act 150, SLH 1971) is not helpful. *See* SC Rep. No. 157, 1971 HOUSE JOURNAL at 742-743; SC Rep. No. 685, 1971 SENATE JOURNAL at 1102.

HRS § 1-14 (1976) provides that "[t]he words of a law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning".

In construing the term "accident", HRS § 701-104 (1976)[5] (Principles of construction) requires "a genuine construction, according to the fair import of the words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision".

---

[5] Although HRS § 291C-12 is not part of the Hawaii Penal Code, § 701-104 is applicable to its construction by virtue of § 701-102(3) (1976): "The provisions of chapters 701 through 706 of the Code are applicable to offenses defined by other statutes, unless the Code otherwise provides."

The following definition is from WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 11 (1967):

[A]ccident. 1a: an event or condition occurring by chance or arising from unknown or remote causes, b: lack of intention or necessity, c: an unforeseen unplanned event or condition; 2a: a usu. sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result, b: an unexpected medical development esp. of an unfavorable or injurious nature occurring in apparently good health or during the course of a disease or a treatment, c: an unexpected happening causing loss or injury which is not due to any fault or misconduct on the part of the person injured but from the consequences of which he may be entitled to some legal relief; 3: an adventitious characteristic that is either inseparable from the individual and the species; *broadly:* any fortuitous or nonessential property, fact, or circumstance; 4: an irregularity of a surface.

(Pronunciation, symbols, bracketed language omitted.)

BLACK'S LAW DICTIONARY 14 (5th ed. 1979) states: [In] its most commonly accepted meaning, or in its ordinary or popular sense, the word may be defined as meaning: a fortuitous circumstance, event, or happening; an event happening without any human agency, or if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens; an unusual, fortuitous, unexpected, unforeseen or unlooked for event, happening or occurrence; an unusual or unexpected result attending the operation or performance of a usual or necessary act or event; chance or contingency, fortune; mishap; some sudden and unexpected event taking place without expectation, upon the instant, rather than something happening by chance; something unforeseen, unexpected, unusual, extraordinary or phenomenal, taking place not according to the usual course of things or events, out of the range of ordinary calculations;

that which exists or occurs abnormally, or an uncommon occurrence.***

This definition is identical to that given in 1 C.J.S. 427-431 (1936) under the subtitle "Common Popular Sense" of the topic "Accident".

The State offers no definition of "accident", but in its brief uses the word "incident" to describe the kind of event that triggers the duties set forth in HRS §§ 291C-12 and -14.

The information required to be given by HRS § 291C-14 (the driver's name and address, the vehicle registration number, and, upon request, to exhibit his or her license or permit to drive) is information necessary to resolve questions of civil liability. The duty to render aid is clearly intended to furnish accident victims prompt assistance in order to minimize their injuries.

We hold that the word "accident", taken in its usual sense, and with reference to the purpose of HRS § 291C-12, excludes the event that occurred in this case. An intentional attempt to murder a person by using one's vehicle as a weapon does not fit within the general, popular, usual sense of the word "accident".[6]

Therefore, applying HRS § 701-109(1)(c), Liuafi could not be convicted[7] of both attempted murder and of violation of HRS § 291C-12. The trial court should have so instructed the jury.

Inconsistent verdicts are not per se grounds for reversal. *See Dunn v. United States*, 284 U.S. 390 (1932), *United States v. Magnus*, 365 F.2d 1007 at 1010 (2d Cir. 1966). Reversal of a conviction on one or more counts on an information does not dictate similar action as to all counts unless prejudice is shown. *Ruark v. People*, Colo., 406 P.2d 91, 94 (1965). *See State v. Meyer*, 61 Haw. 74, 595 P.2d 288 (1979).

We are convinced that Liuafi's conviction for attempted murder was not a product of the trial court's failure to instruct

---

[6] We do not affirmatively define "accident", as it is unnecessary to our task in this case.

[7] It was not error to charge Liuafi with the commission of both offenses. *See* HRS § 701-109(1).

the jury that the two offenses charged were mutually exclusive. The specificity of the instructions on the attempted murder charge, the strength of the State's case on that charge and the lack of definitional certainty on the hit-and-run charge lead us to conclude that the proper disposition is to vacate the judgment of conviction as to HRS. § 291C-12.

Our disposition of this point obviates the need to consider Liuafi's contentions regarding the constitutionality of HRS § 291C-12 and the trial court's failure to instruct the jury on state of mind as an element of the offense defined by that provision.

Liuafi's conviction for violation of HRS § 291C-12 is vacated; his conviction for violation of HRS §§ 705-500 and 707-701 is affirmed.

*Stanford H. Nakamoto (Riccio M. Tanaka* on the opening brief), deputy public defenders, for defendant-appellant.

*Lee T. Nakamura,* deputy prosecuting attorney, for plaintiff-appellee.