UNITED STATES, Appellee,

v.

Specialist Nicholas N. HAMMOND,
United States Army, Appellant.

ARMY 20010710.

U.S. Army Court of Criminal Appeals.

29 June 2004.

For Appellant: Colonel Robert D. Teetsel, JA; Captain Mary E. Card, JA; Captain Kathy Martin, JA (on brief); Colonel Robert D. Teetsel, JA; Lieutenant Colonel Mark Tellitocci, JA; Major Allyson G. Lambert, JA; Captain Kathy Martin, JA (on specified issues).

For Appellee: Colonel Lauren B. Leeker, JA; Lieutenant Colonel Margaret B. Baines, JA; Lieutenant Colonel Randy V. Cargill, JA, USAR (on brief); Lieutenant Colonel Margaret B. Baines, JA; Lieutenant Colonel Randy V. Cargill, JA, USAR (on specified issues).

Before PIETSCH, Chief Judge, HARVEY, Senior Judge, and SCHENCK, Appellate Military Judge.

OPINION OF THE COURT

PIETSCH, Chief Judge:[1]

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of aggravated assault with intentional infliction of grievous bodily harm, assault consummated by a battery, and leaving the scene of a collision, in violation of Articles 128 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 928 and 934 [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a dishonorable discharge, confinement for 4 years and 134 days, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority also approved 134 days of confinement credit. This case is before the court for review pursuant to Article 66, UCMJ, 10 U.S.C. § 866.

We discuss seven issues, but conclude that only one merits sentence relief. First, we hold that appellant is not entitled to pay and allowances as he was in pretrial confinement after his expiration term of service (ETS) date. Additionally, the government did not violate Article 13, UCMJ, 10 U.S.C. § 813, by failing to extend appellant's ETS date to the date of his trial. Second, fleeing the scene of an intentional collision states an offense under Article 134, UCMJ. Third, appellant's conviction of fleeing the scene of an intentional collision does not violate the Fifth Amendment or Article 31, UCMJ, 10 U.S.C. § 831. Fourth, appellant's separate convictions of aggravated assault with intentional infliction of grievous bodily harm and fleeing the scene of an intentional collision are not multiplicious or an unreasonable multiplication of the charges. Fifth, these same two offenses are not so inconsistent with each other as to require remedial action. Sixth, the adjudged confinement of 4 years and 134 days is not an illegal sentence. Seventh, we

---

1. Chief Judge Pietsch took final action while on active duty in May 2004.

will reduce appellant's confinement by thirty days to moot appellant's claim of prejudice resulting from the staff judge advocate's (SJA's) misstatement of the maximum possible sentence in his post-trial recommendation (SJAR) to the convening authority.

## FACTS

Appellant intentionally inflicted physical harm on his spouse, Petty Officer (PO) Hammond, on two separate occasions. First, appellant went to his wife's home and in the course of an argument, appellant pushed PO Hammond and then hit her in the face two or three times with his fist. Petty Officer Hammond fled to a military police guard shack. Appellant received company level, nonjudicial punishment under Article 15, UCMJ, for this misconduct. At his trial, the military judge awarded fifteen days of confinement credit to compensate appellant for this pretrial punishment.[2]

Seven months later, appellant was driving his vehicle on Fort Gordon, Georgia, with PO Hammond riding as passenger. During a quarrel, appellant pulled to the side of the road. While the vehicle was still rolling, PO Hammond opened the door, jumped out, and rolled free of the vehicle onto the ground.

Staff Sergeant (SSG) Soper, a witness to the collision, pulled his vehicle over to offer PO Hammond assistance. Meanwhile, appellant turned his vehicle around, crossed traffic, and accelerated against traffic on the road shoulder—driving directly into PO Hammond. Appellant's vehicle hit PO Hammond at a speed of about thirty-five miles per hour. Petty Officer Hammond's body was dashed against the hood and windshield and then went over the roof. She was thrown about twenty-five feet from appellant's vehicle. Petty Officer Hammond suffered head trauma, two broken bones in her leg, and multiple lacerations and abrasions to

her face, arms, and body that required plastic surgery. In the collision, appellant also struck and damaged SSG Soper's vehicle.

Appellant fled the scene in his vehicle at a high rate of speed. Two witnesses chased appellant across Fort Gordon and through traffic in their own vehicles. Appellant went through or around several stop signs and a traffic light; he stopped only when one of the witnesses boxed him in near a military police guard shack. A military policeman promptly apprehended appellant.

## DISCUSSION

### A. Pretrial Administrative Termination of Pay and Allowances

■ Appellant's ETS date passed while he was in pretrial confinement, and the Department of Defense Finance and Accounting Service (DFAS) stopped paying him. In his *Grostefon*[3] statement, appellant asserts: "When my ETS date arrived, I stopped receiving pay. I think that finance unfairly stopped my pay. Other soldiers in pre-trial confinement status continued to receive pay past their ETS dates."

Although waiver currently applies when allegations of Article 13 violations are not raised at trial,[4] we decline to apply waiver under the particular facts and circumstances of appellant's case. *See United States v. Singleton*, 59 M.J. 618, 622–23 (Army Ct. Crim.App.2003) (discussing waiver of unlawful pretrial punishment). We will address this issue on its merits. Government and defense appellate counsel now agree that, under the applicable finance regulation, DFAS had no duty to pay appellant after his ETS date.[5] Appellant asserts, however, that his unit's failure to extend his ETS date so he would continue to receive pay until his trial was unlawful because other soldiers in

2. *See United States v. Pierce*, 27 M.J. 367, 369 (C.M.A.1989) (holding an accused convicted at a later court-martial for the same offense(s) that served as a basis for punishment under Article 15, UCMJ, is entitled to a credit against his approved sentence for that prior punishment).

3. *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

4. *United States v. Inong*, 58 M.J. 460, 463–64 (C.A.A.F.2003).

5. *See* Dep't of Def. Fin. Mgt. Reg., Vol. 7A: Military Pay Policy and Procedures—Active Duty and Reserve Pay, ch. 1, para. 010302G.1, at 1–30 (July 1996) (IC 23–03, May 2003), http://www.dod.mil/comptroller/fmr/07a/.

similar circumstances received more favorable treatment in this regard, thereby creating a situation so grossly unfair that it amounted to punishment in violation of Article 13, UCMJ.

"No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him . . . ." UCMJ art. 13. The stopping of appellant's pay after his ETS date, by itself, does not constitute a punishment or penalty. As the Office of the Comptroller General persuasively explained to the Secretary of the Army over fifty years ago:

[P]ay and allowances simply do not accrue to an enlisted person after the expiration of his enlistment, unless he is held in the service for the convenience of the Government or for the purpose of making good time lost, and . . . the nonpayment of pay and allowances which do not accrue does not constitute a . . . punishment or penalty . . . .

30 Comp. Gen. 449, *5–6 (1951); *see also Cowden v. United States,* 220 Ct.Cl. 490, 600 F.2d 1354, 1359 (1979) ("[A]n enlisted man confined after expiration of his term of enlistment is due pay and allowances for that period of confinement, if the original conviction is invalidated and either no new trial occurs, or one does occur and results in acquittal."); *Moses v. United States,* 137 Ct. Cl. 374, 389, 1957 WL 8298 (1957) (holding that pay and allowances terminate when enlistment expires during confinement, subject to a return to duty status); *see also Curry v. United States,* 52 Fed.Cl. 799, 804 (2002) (expressly leaving open the issue of whether pay and allowances continue after ETS for marine in pretrial confinement), *aff'd,* 60 Fed.Appx. 312 (Fed.Cir.2003). A failure to extend an ETS date also does not amount to a "punishment or penalty" within the meaning of Article 13, UCMJ. Appellant has no right to an extension of his enlistment. *See* Army Reg. 601–280, Personnel Procurement: Army Retention Program, para. 4–9 (31 Mar. 1999) (listing reasons for extensions of enlistment).

6. Unless stated otherwise, the provision in existence at the time of appellant's trial remains in

Finally, Article 13, UCMJ, is not violated even if other soldiers in pretrial confinement had their ETS dates extended. Article 13 prohibits pretrial punishment. It does not guarantee exactly equal conditions of detention. Discrimination on invidious grounds could violate due process, but appellant has not alleged that he received different treatment based on any "distinction which is so unjustifiable" that it violates this constitutional guarantee. *United States v. Isler,* 36 M.J. 1061, 1066 (A.F.C.M.R.1993) (holding no pretrial punishment or due process violation where male and female detainees were held in different and somewhat unequal confinement facilities).

### B. Failure to State an Offense

■ Charge II and its Specification allege that appellant violated Article 134, UCMJ, by fleeing the scene of a collision. The *Manual for Courts–Martial, United States* (2000 ed.)[6] [hereinafter *MCM,* 2000], contains a sample specification for the offense of fleeing the scene of an accident in violation of Article 134. This sample specification reads as follows:

In that _____ (personal jurisdiction data), (the driver of) (a passenger in) (the senior officer/noncommissioned officer in) (_____ in) a vehicle at the time of an accident in which said vehicle was involved, and having knowledge of said accident, did, at _____ (subject-matter jurisdiction data, if required), on or about _____ 20 _____ (wrongfully leave) (by _____, assist the driver of the said vehicle in wrongfully leaving) (wrongfully order, cause, or permit the driver to leave) the scene of the accident without (providing assistance to _____, who had been struck (and injured) by the said vehicle) (making his/her (the driver's) identity known).

*MCM,* 2000, Part IV, para. 82f (footnotes omitted). The sample specification closely resembles similar charging language upheld in *United States v. Eagleson,* 3 U.S.C.M.A. 685, 688–92, 14 C.M.R. 103, 106–10, 1954 WL 2099 (1954). We have no doubt that this sample specification properly states an of-

effect in the *MCM,* 2002.

fense under Article 134, UCMJ. *See generally United States v. Saintaude,* 56 M.J. 888, 889–891 (Army Ct.Crim.App.2002) (discussing waiver, standard of review, and Article 134, UCMJ, specifications that fail to state offenses).

In appellant's case, however, Charge II and its Specification do not exactly follow the language of the sample specification. Significantly, the charge sheet uses the word "collision" where the sample specification uses the word "accident." Charge II and its Specification allege:

> In that [Appellant], the driver of a vehicle at the time of a *collision* in which said vehicle was involved, and having knowledge of said *collision,* did, at or near Fort Gordon, Georgia, on or about 12 April 2001, wrongfully and unlawfully leave the scene of the *collision* without providing assistance to Stacey Hammond, whose body had been struck and injured, or providing assistance to Shadd Soper, whose vehicle had been struck.

(Emphasis added.)

Appellate defense counsel argue that substituting the word "collision" for "accident" rendered the charge defective. They assert that the "drafters of the military's 'hit and run' offense"—namely, the sample specification in *MCM,* 2000, Part IV, para. 82f—"set the boundaries for situations that could be charged under the offense." Brief at 18–19. They contend that these boundaries do not include collisions that result from intentional acts, as opposed to inadvertent accidents.

This argument misperceives the nature of the Article 134 sample specifications. Article 134, the "General Article," allows courts-martial to try, among other things, " 'all disorders and neglects to the prejudice of good order and discipline in the armed forces, [and] all conduct of a nature to bring discredit upon the armed forces,' " even if the disorders, neglects, or forms of conduct are " 'not specifically mentioned' " in other articles of the UCMJ. *MCM,* 2000, Part IV, para. 60a. In the *MCM,* 2000, the President has identified various offenses that violate Article 134

as he interprets that article. *See id.* at Part IV, paras. 61–113. The *MCM,* 2000, however, expressly indicates that the list is not comprehensive and exclusive, stating: "If conduct by an accused does not fall under any of the listed offenses for violations of Article 134 in this Manual (paragraphs 61 through 113 of this Part) a specification not listed in this Manual may be used to allege the offense." *Id.* at Part. IV, para. 60c(6)(c).[7] Accordingly, the mere fact that Charge II does not match precisely the language of the sample specification does not make the charge improper. *See United States v. Jones,* 14 M.J. 740, 742 (A.F.C.M.R.1982) ("[F]ailure to follow a model specification is not determinative of whether a specification states an offense.").

Specifications under Article 134, UCMJ, do have limits. Courts-martial, for example, cannot use Article 134 to reach conduct covered by the more specific articles. For example, in *United States v. McCormick,* 12 U.S.C.M.A. 26, 27, 30 C.M.R. 26, 27, 1960 WL 4629 (1960), the accused assaulted a twelve-year-old boy. The appellant was charged with violation of Article 134 instead of Article 128, which prohibits assaults. *Id.,* 30 C.M.R. at 27. The court ruled that the Article 134 charge was improper, stating: "Congress has acted fully with respect to this offense by its passage of ... Article 128. Hence, the statute is pre-emptive of the general Article." *Id.* at 28, 30 C.M.R. at 28. In this case, however, while Article 128 addresses assaults, no provision other than Article 134 concerns leaving the scene of a vehicular collision. *See MCM,* 2000, Part IV, paras. 1–59 and 82.

In our view, if leaving the scene of an accident violates Article 134, then leaving the scene of a collision does so as well. The fact that appellant intentionally caused the collision does not make his conduct less prejudicial to good order or less discrediting of the armed forces. On the contrary, if anything, it makes appellant's conduct more culpable.

---

**7.** *See United States v. Rowe,* 13 U.S.C.M.A. 302, 306, 308, 312, 32 C.M.R. 302, 306, 308, 312, 1962 WL 4491 (1962) (holding that failure to render aid after vehicle accident by not transporting victim (wife) for medical care was service discrediting under Article 134).

## C.  Self–Incrimination

■ Appellant argues that punishing him for fleeing the scene of the collision violates his Fifth Amendment privilege against self-incrimination and his Article 31, UCMJ, rights.  Appellant reasons that any requirement for him to remain at the scene would "necessarily compel[ ] incriminating disclosures."  We disagree.

In *California v. Byers*, 402 U.S. 424, 425, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), the defendant contested his conviction under a California statute for failing to stop and identify himself after being involved in an accident.  The defendant, like appellant in this case, said that staying at the scene would have had a tendency to incriminate him.  *Id.* at 426, 91 S.Ct. 1535.  The Supreme Court rejected this claim.  In a plurality opinion, four justices concluded that stopping at the scene of an accident and revealing one's name and vehicle information does not violate the privilege against self-incrimination because such conduct is not testimonial nor, by itself, incriminating.  *Id.* at 434, 91 S.Ct. 1535.  They explained:

> Although identity, when made known, may lead to inquiry that in turn leads to arrest and charge, those developments depend on different factors and independent evidence.  Here the compelled disclosure of identity could have led to a charge that might not have been made had the driver fled the scene; but this is true only in the same sense that a taxpayer can be charged on the basis of the contents of a tax return or failure to file an income tax form.  There is no constitutional right to refuse to file an income tax return or to flee the scene of an accident in order to avoid the possibility of legal involvement.

*Id.*  Justice Harlan, concurring in the judgment, stated that the statute did not violate the Fifth Amendment because it had the "noncriminal governmental purpose" of gathering information to ensure financial responsibility for accidents, self-reporting was a necessary means of securing the information, and minimal disclosure was required.  *See id.* at 440, 458, 91 S.Ct. 1535.  The Supreme

Court's judgment in *Byers* was consistent with existing military precedent.  *See, e.g., United States v. Smith*, 9 U.S.C.M.A. 240, 26 C.M.R. 20, 1958 WL 3283 (1958) (upholding against claim of self-incrimination, a regulation requiring motorists to report their vehicle accidents).

Our superior court distinguished *California v. Byers* in *United States v. Heyward*, 22 M.J. 35 (C.M.A.), *amended by* 22 M.J. 274 (C.M.A.), *cert. denied*, 479 U.S. 1011, 107 S.Ct. 656, 93 L.Ed.2d 710 (1986).  In *Heyward*, the court held that a service member could not be punished for failing to report drug use by others on occasions when he also was using drugs.  *Id.* at 37–38.  Applying both the Fifth Amendment and Article 31, UCMJ, the court reasoned that the drug reporting requirement was directed at an "essentially criminal area of inquiry" and that disclosure of the drug use had a more significant "incriminating potential"[8] than, for example, merely staying at the scene of an accident.

Appellant argues that his case is more like *Heyward* than *Byers*.  In contrast to the California "hit and run" statute in *Byers*, appellant contends that Article 134 has solely a criminal purpose, as did the drug reporting statute in *Heyward*.  We agree that Article 134 has a criminal law purpose and that *Heyward* is relevant.

In *Heyward*, our superior court interpreted *Byers* to require a balancing of "the important governmental purpose in securing . . . information against the right of the servicemember to be protected from compulsory self-incrimination."  *Id.* at 37.  On balance, we do not see in appellant's case the same kind of self-incrimination that was present in *Heyward*.  As the plurality opinion explained in *Byers*, although staying at the scene "may lead to inquiry that in turn leads to arrest and charge, those developments depend on different factors and independent evidence."  402 U.S. at 434, 91 S.Ct. 1535.  This statement is especially true here, where the victim knew appellant's identity even before the collision occurred and other witnesses chased appellant until military police apprehended him.

---

8.  *Id.* at 37.

## D. Multiplication of Charges

■ Convicting appellant of both aggravated assault with intentional infliction of grievous bodily harm in violation of Article 128, UCMJ, and fleeing the scene of a collision in violation of Article 134, UCMJ, does not violate the prohibition against multiplicity announced in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In *Blockburger*, the Supreme Court held that a defendant cannot be convicted of two offenses that are in reality one and the same. *See id.* at 304, 52 S.Ct. 180. The test for "whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* In this case, the first two charges state distinct offenses. One requires proof of an intentional assault; the other requires proof of fleeing the scene of a collision. Each charge has at least one element not required by the other. *See United States v. Teters*, 37 M.J. 370, 377 (C.M.A.1993) (applying *Blockburger*).

■ Whether conviction of both charges violates the prohibition against an "unreasonable multiplication of charges" is a separate question. In *United States v. Quiroz*, 55 M.J. 334, 337–38 (C.A.A.F.2001), our superior court held that this doctrine seeks to curb "overreaching in the exercise of prosecutorial discretion" even when charges do not violate the multiplicity test in *Blockburger*. In determining the reasonableness of the multiple charges at issue in *Quiroz*, the Navy Marine Court of Criminal Appeals considered five questions:

(1) "Did the accused object at trial that there was an unreasonable multiplication of charges and/or specifications?"; (2) "Is each charge and specification aimed at distinctly separate criminal acts?"; (3) "Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?"; (4) "Does the number of charges and specifications *unfairly* increase the appellant's punitive exposure?"; and (5) "Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?"

*Id.* at 338 (quoting *United States v. Quiroz*, 53 M.J. 600, 607 (N.M.Ct.Crim.App.2000)). The Court of Appeals for the Armed Forces generally approved these factors as guides, agreeing with the service court that the list was not intended to be " 'all-inclusive.' " *Id.* (citation omitted). They noted a caveat, however, indicating that the fourth question should have asked whether the charge "unreasonably," rather than "unfairly," increases punitive exposure. *Id.* at 338–39.

Considering these factors and the totality of the circumstances, we do not find an unreasonable multiplication of charges. Even though the first two charges related to some of the same criminal behavior, we do not find prosecutorial overreaching. Appellant did not object to unreasonable multiplication of the charges prior to pleading guilty to these same two charges. The charges did not unreasonably increase appellant's punitive exposure. His vehicle struck not only his wife, but inadvertently also hit SSG Soper's vehicle. In addition, appellant's flight through Fort Gordon involved a high speed chase that was clearly reckless and prejudicial to good order and discipline or service discrediting.[9] The convening authority and trial counsel could lawfully decide that merely charging appellant with aggravated assault, and not with leaving the scene of a collision, would fail to capture the full extent of appellant's criminality.

## E. Inconsistent Charges

■ Appellate defense counsel urge us to apply the logic of *State v. Liuafi*, 1 Haw.App. 625, 623 P.2d 1271 (1981), and dismiss the specification alleging fleeing the scene of a collision. In *Liuafi*, the defendant intentionally struck a pedestrian with his vehicle and then drove away. *Id.* at 1273–74. Liuafi was convicted of attempted murder and failure to render assistance to the victim of an accident. *Id.* at 1273. The Intermediate Court of Appeals of Hawaii found the two charges inconsistent because an attempted murder, due to its intentional nature, could

---

9. We note that appellant's reckless operation of his motor vehicle after the collision, as he attempted to evade witnesses, violates Article 111, UCMJ, 10 U.S.C. § 911. *See United States v. Nourse*, 55 M.J. 229, 229–30 (C.A.A.F.2001); *MCM*, 2000, Part IV, para. 35.

not qualify as an "accident." *Id.* at 1282. Cases interpreting similar "hit and run" statutes from other states disagree with this reasoning and conclusion. *See, e.g., People v. Martinson,* 161 Mich.App. 55, 409 N.W.2d 754, 755–756 (1987) (holding that an "accident" under "hit and run" statute may result from either intentional or unintentional conduct); *State v. Smyth,* 121 R.I. 188, 397 A.2d 497, 499 (1979) (holding same); *State v. Parker,* 299 Or. 534, 704 P.2d 1144, 1148–49 (1985) (holding same).

In any event, *Liuafi* is distinguishable from the present case. Here, as noted, appellant pleaded guilty to an aggravated assault and fleeing the scene of a "collision." There is no contradiction or inconsistency in appellant's conviction of both an aggravated assault with intentional infliction of grievous bodily harm and leaving the scene of a collision because the collision can and did result from appellant's intentional conduct.

### F. Unlawful Sentence

■ The military judge ordered 119 days of *Allen*[10] credit and 15 days of *Pierce* credit against appellant's sentence to confinement (for a total of 134 days of credit), but then sentenced appellant to 4 years and 134 days of confinement. Appellant argues that this sentence effectively nullified the requirement to award confinement credit and is therefore unlawful. In a summary response, government appellate counsel recommend that we affirm four years of confinement. We disagree with appellate counsel for both sides and decline to grant relief.

Our superior court's decision in *United States v. Balboa,* 33 M.J. 304 (C.M.A.1991), is controlling. In *Balboa,* after the military judge instructed the members that the accused had spent sixty-eight days in pretrial confinement, the members sentenced him to confinement for twelve months and sixty-eight days. *Id.* at 305. Our superior court upheld the sentence, stating that "neither the decision of this Court in *United States v. Allen* ... nor the Manual for Courts–Martial precludes a court from attempting to fashion an appropriate sentence of confinement in

view of time actually served." *Id.* at 307. As such, in appellant's case the military judge did not act improperly in sentencing appellant to 4 years and 134 days of confinement. We decline to order sentence relief.

### G. Staff Judge Advocate's Post–Trial Recommendation (SJAR)

■ The SJAR is not required to include the maximum possible sentence. *See* Rule for Court–Martial [hereinafter R.C.M.] 1106(d)(3). The SJAR, submitted to the convening authority pursuant to R.C.M. 1106, indicates that the maximum sentence based on the findings included confinement for life without the possibility of parole. The parties agree that the maximum possible sentence, in fact, included six years of confinement. Appellant's trial defense counsel submitted matters for the convening authority's consideration under R.C.M. 1105, but did not object to the SJAR's error. The acting SJA made no correction in her addendum to the SJAR.

Appellate defense counsel argue that the SJAR error unfairly prejudiced appellant's ability to obtain clemency from the convening authority. Appellate government counsel counter that appellant waived any objection by failing to call this error to the attention of the convening authority, despite having the opportunity to do so under R.C.M. 1106(f)(6). We disagree with appellate government counsel.

Although failure to comment on a matter in the SJAR ordinarily waives any later objection, such waiver occurs only "in the absence of plain error." R.C.M. 1106(f)(6). In our view, plain error occurred in this case. The SJA's mistake was obvious, and "because clemency is a highly discretionary function ... only a colorable showing of possible prejudice is necessary to establish material prejudice to the substantial rights of the appellant under Article 59(a), UCMJ, 10 U.S.C. § 859(a)." *United States v. Hartfield,* 53 M.J. 719, 720 (Army Ct.Crim.App.2000) (citations and internal quotation marks omitted). There is a " 'colorable showing of possible prejudice' "[11] in this case because the convening authority may have misjudged the

**10.** *See United States v. Allen,* 17 M.J. 126, 128 (C.M.A.1984) (holding that an appellant is entitled to day-for-day confinement credit for pretrial confinement served).

**11.** *United States v. Wheelus,* 49 M.J. 283, 289

seriousness of appellant's offenses based on the SJAR error.

Having found plain error, we "must either provide meaningful relief or return the case to the Judge Advocate General concerned for a remand to a convening authority for a new posttrial recommendation and action." *Wheelus,* 49 M.J. at 289. We choose to exercise our " 'broad power to moot claims of prejudice' as referred to in the context of *Wheelus* ... to address [this] acknowledged post-trial processing error[ ]." *United States v. Fagan,* 59 M.J. 238, 244 (C.A.A.F.2004) (quoting *Wheelus,* 49 M.J. at 288). We will provide relief by reassessing appellant's sentence in our decretal paragraph.

## CONCLUSION

Appellant's personal assertions pursuant to *Grostefon* are without merit. The findings of

(C.A.A.F.1998) (citation omitted).

guilty are affirmed. Reassessing the sentence on the basis of the error noted, the entire record, and the principles of *United States v. Sales,* 22 M.J. 305 (C.M.A.1986), the court affirms only so much of the sentence as provides for a dishonorable discharge, confinement for 4 years and 104 days, forfeiture of all pay and allowances, and reduction to Private E1.

Senior Judge HARVEY and Judge SCHENCK concur.